### UNION OIL CO. OF CALIFORNIA v. AMERICAN BITUMULS CO.
### No. 9152.

Circuit Court of Appeals, Ninth Circuit.
Jan. 16, 1940.

Drury W. Cooper, of New York City, and Paul M. Gregg and Philip Subkow, both of Los Angeles, Cal. (Ford W. Harris, of Los Angeles, Cal., of counsel), for appellant.

Felix T. Smith, of San Francisco, Cal., and Frederick S. Lyon and Leonard S. Lyon, both of Los Angeles, Cal., for appellee.

Before WILBUR, HANEY, and STEPHENS, Circuit Judges.

WILBUR, Circuit Judge.

.This is an appeal from an interlocutory decree holding valid and infringed the two claims of patent No. 1,643,675 issued September 27, 1927, to John Alexander Montgomerie and ordering an accounting.

This patent covers a process for manufacturing a stable emulsion of asphalt. As the patent states, a process was known for preparing an aqueous bituminous emulsion. This old process required the addition of a small proportion of fatty acid or resin oil and then adding with agitation a dilute solution of caustic soda, or caustic potash, or sodium or potassium carbonate, at a temperature of about 215° or 225° F. The same result could be obtained by the addition of soap with agitation to the melted asphalt and water. The patentee claims to have discovered that such an emulsion could be prepared without the addition of fatty acid or resin oil if the melted bitumen was poured into a hot dilute, aqueous, alkaline solution, or vice versa.

At the time the patentee made his discovery, he was experimenting with Mexican asphalt, a refinery product consisting of the residuum left after removing by distillation all the more volatile parts of the Mexican crude petroleum oil, including the lubricating oils. It was known that some of the more volatile constituents of crude oil in-

cluding the lubricating oils would react with alkalies to produce a soap. It was not known that when these substances had been removed from crude oil by distillation that the remaining product, called asphalt, contained any material capable of reacting with an alkaline solution to produce what is chemically known as soap. What the patentee discovered was the existence in asphalt of material capable of reacting with alkali by a process called saponification which produced a soap capable of stabilizing the water and asphalt emulsion. Having discovered this saponifiable material in solid asphalt, not by isolating it nor by analyzing it, but by the fact that melted asphalt did emulsify with water and alkali without the addition of any fatty acid, the patentee outlined the process by which he proposed to utilize the discovery in the making of a suitable emulsion of asphalt to be used for roadmaking and other purposes.

The process involved the mixing with agitation of melted asphalt and a hot aqueous alkaline solution. The example given in the patent calls for the mixing of 800 parts, by weight, of Mexican asphalt, 4 parts of caustic potash and 560 parts of water in which the caustic potash is dissolved. The temperatures involved in the process will be stated and considered more in detail later in the opinion because of the fact that the appellant denies infringement upon the ground that its process is carried on at temperatures much lower than those mentioned in the specifications and claims of the patent.

The appellant also claims that the patent disclosures are too uncertain and vague to justify the issuance of the patent because the word "asphalt" is not sufficiently clear to disclose the type of asphalt which may be successfully emulsified by the process. The evidence shows that some asphalts cannot be emulsified by the patentee's process because they do not contain sufficient saponifiable material. Mexican, Texas, Oklahoma and California asphalts cán be successfully emulsified by the patented process but asphalt resulting from the distillation of crude petroleum oil in the midwestern states, Colorado, Wyoming and Montana, will not emulsify by the process. Moreover, natural asphalts will emulsify by the patented process because in addition to the saponifiable material such as is contained in the residuum after distillation of Mexican, California and other petroleum oils, they also contain more volatile elements which can also be saponified by the use of an alkali only but which would have been eliminated by artificial distillation. The patent excludes in its specifications and claims the emulsification of such material as natural asphalt, containing oils, tars, or other material which will saponify with alkali at a temperature of $110^0$ F. This exclusion is by way of definition of the sort of "asphalt" or "bitumen" to which the patent process applies.

The patent uses the word "bitumen" as synonymous with "asphalt" which it defines as follows: "By the term 'bitumen' is meant mineral pitch or asphalt to the exclusion of fluids, such as tars, oil, etc., which it has previously been proposed to mix or saponify with dilute aqueous caustic alkaline solution when heated, up to $110^0$ F."

That is to say, the term "bitumen" as used in the patent does not contain those constituents of petroleum such as tars, oils, etc., which had been theretofore saponified in the art by the use of a dilute aqueous caustic alkaline solution heated to $110^0$ F, nor asphalt containing them.

In claim No. 2 the asphalt to be emulsified is described as "the Mexican asphalt which is solid at normal temperature." In claim No. 1 the corresponding phrase is "asphalt containing in its natural state a saponifiable material solid at normal temperature." That is to say, the saponifiable material in the asphalt is solid at normal temperatures.

In the original patent application nothing is said about the proposition that the asphalt or a portion of it was saponified in the process of producing a stable aqueous emulsion of asphalt. The discovery claimed and the process described purported to cover a method of producing an aqueous bituminous emulsion by mixing and stirring hot asphalt and a hot dilute aqueous alkaline solution. The claimant did not attempt to determine or describe the chemical reactions involved in the process other than to characterize the product desired as a bituminous emulsion. In response to the suggestion of the patent office that the asphalt itself did not saponify and that it must be some ingredient in the asphalt which did saponify, and the request that the claimant indicate his opinion as to the character of the portion of the asphalt which saponified, the claimant added the following paragraph to the proposed specifications: "It is believed that the ingredi-

ent of Mexican asphalt saponified by the treatment with alkali is one or other of the carboxylic acid derivatives or hydroxy derivatives of the naphthenes or a mixture of these. The properties of these substances have not yet been fully investigated by chemists."

The appellant claims that the only real discovery involved in this patent is that made by the patent office and disclosed by it when it suggested to the claimant that the asphalt itself did not saponify but that some substance therein was saponified. Subsequent research has justified the conclusion that the emulsification of asphalt, by the patented process, results from the saponification of some materials contained therein. But the whole question involved in appellant's contention is a mere matter of terminology. If it was necessary, as is now admitted, that in order to produce an aqueous emulsion of bitumen soap must in some way be introduced into the mixture, then it necessarily follows that the successful process discovered by the patentee involves the production of soap. If soap is produced in the process by the addition of alkali to asphalt it follows that the soap is produced by the action of the alkali upon some portion of the asphalt which for lack of more definite terminology may be characterized as a saponifiable ingredient.

The communication of the patent office above referred to called upon the patentee to indicate his judgment as to the chemical characteristics of this saponifiable material. It is quite immaterial whether or not the claimant correctly characterized or named this saponifiable material. See, Walker on Patents, Deller's Ed. 756. If an aqueous emulsion of asphalt was possible only because of the presence of soap in the mixture, the process described by the claimant must have produced such soap. Subsequent research has developed, and the testimony in the case shows, that there is in asphalt a substance or substances solid at normal temperatures which can be saponified. The resulting soap can be and has been separated from the emulsion and its physical characteristics determined.

This knowledge as to the chemical characteristics, or formulae, of the saponifiable material in solid asphalt was not necessary to the successful operation of the process. It is true, however, that knowledge of the percentage of saponifiable material contained in a given asphalt is important in determining whether or not that particular asphalt can be emulsified by the process described in the patent. The evidence shows it must have about one per cent.

Cases are cited by the appellant in support of its claim that uncertainty in the description of asphalt to be emulsified by the patent process invalidates the patent. These cases are inapplicable because, as we will now show, there is no uncertainty in the patent.

It is true that in the light of knowledge acquired by the patentee and by the industry subsequent to the issuance of patent, a more definite description of the kind of asphalt which can be emulsified by the process could be given now. That is to say, the emulsifiable asphalt could be characterized as an asphalt residuum solid at normal temperature containing one per cent, or thereabouts, of saponifiable material. But such a description was wholly unnecessary to the validity of the patent. The patent gives as an example the emulsification of Mexican asphalt by the process described.

The second claim of the patent is for the emulsification of an asphalt which is described as "Mexican asphalt". The term "Mexican asphalt" is a well known name in the trade and describes a well known material which contains more than one per cent of saponifiable material.

Claim 1,[1] was perhaps unnecessary for, if we assume that "Mexican asphalt" contains a saponifiable material, that name would cover the use of an equivalent asphalt. It is unnecessary to consider on this appeal the question of whether or not these two claims overlap or whether more than the one claim for the emulsification of Mexican asphalt was necessary. Certainly claim No. 1 eliminates the contention of non-infringement by the use in the process of other asphalts having a slightly different content of saponifiable material. The fact that there may be, and indeed are, asphalts which cannot be emulsified by this process, does not render the patent indefinite or uncertain. The patent does not attempt to

---

[1] Claim 1 of the patent is: "1. The process of producing a stable liquid emulsion consisting in mixing directly, while stirring, melted asphalt containing in its natural state a saponifiable material solid at normal temperature and dilute aqueous-caustic alkaline solution at a temperature of about 215° F., to effect a reaction between the alkali and the saponifiable ingredient of said asphalt."

cover any process for emulsifying an asphalt which was incapable of emulsification by the use of alkali alone. We conclude that the patent is not uncertain in this respect.

■ The appellant also claims that the amendments and additions to the specifications which define asphalt and which characterize the saponifiable material therein (lines 62 to 74 of the patent) made at the suggestion of the patent examiner should have been verified by a supplemental oath of the applicant and in default thereof the patent is void, either for uncertainty or for lack of an oath to support the new matter making it certain. We conclude that this oath was unnecessary. The additions did not enlarge the scope of the original specifications of the application. Michigan Carton Co. v. Sutherland Paper Co., 6 Cir., 29 F.2d 179, 184.

### The Process Temperature.

The appellant contends that it has escaped infringement by the use in its process of much lower temperatures than those specified in the patent. It contends that by reason of occurrences shown by the patent file the patent claims must be strictly limited to the temperature of "about 215° F."

It is not disputed that the temperature is not a critical factor in the process if the emulsion is produced at temperatures that are "hot". In the patent specifications as originally presented and as finally issued, there is a reference to the use of temperatures from 215° to 225° F in the then known practice of producing an emulsion. The specifications provided for the use of melted bitumen to be poured in the hot alkaline solution. It is clear from this description that the asphalt should be melted to a point where it was quite fluid and this would indicate a temperature of between 275° and 350° F. In the patent specifications as issued the temperature of the alkaline solution is described in three places as "hot". It is also stated that either the melted asphalt may be poured in the alkaline solution, or the hot alkaline solution may be added to the melted bitumen. In either event, it is specified that the "temperature of the mixture during the addition is maintained at about 100° C [212° F]." Temperature is again mentioned in the amended specifications with reference to the emulsion of tars, oils, etc., which, it is stated, had been previously saponified and emulsified at 110° F. Claims 1 and 2, as originally made, were for a "hot dilute aqueous alkaline solution" mixed with "melted bitumen". These original claims were all rejected and amended claims were filed, none of which mentioned the process temperature more specifically. These amended claims were rejected as anticipated by a patent to Page, No. 1,000,545, issued August 15, 1911, which provided for the making of material for water proofing and for road surfaces by the mixing ordinary cement mortar or concrete mixtures before they hardened with a "non-volatile mineral oil or oil residuum, preferably such as have a sticky or greasy base sufficiently viscous or fluid to flow readily". The patent provides that this oil or oil residuum is poured into a concrete mixture which is then mixed in the usual way until the mass is homeogenous. Page adds: "I produce an emulsion of the oil and the emulsification should itself be effected in the concrete immediately after mixing, the free alkali present acting as an emulsifier. Alkali is usually present in cement in quantity sufficient to effect this emulsification. If not, a little alkali may be added before mixing the concrete. The oil then emulsifies rapidly and thoroughly mixes with the other ingredients and becomes permanently and evenly incorporated therewith."

Page speaks throughout the patent of "oil" but in one or two instances uses the word "bitumen", for instance, stating: "The repellant nature of the oil or bitumen keeps the concrete waterproof and its toughness when a suitable oil is used gives the same quality to the concrete. The bitumen or oil fills the voids left by the set cement binder and to a greater or less extent possibly helps to hold together the sand aggregate."

The patent, in another place, refers to "oil or residuum". Page further indicates the character of the oil as follows: "It has been shown by experiment that mineral oils with a high flash point are preferable, those of the non-volatile variety being preferable."

Page's claims all refer to a non-volatile mineral oil.

In reply to this rejection the applicant contended that the Page process did not anticipate the claimed invention. Claimant contended that bitumen, such as used in this process, could not be emulsified by the cold process of Page. He pointed out that the Mackay process for emulsification of bitumen exemplified in British patents and

referred to in his own application, had solved the problem of obtaining an aqueous bituminous emulsion by the adoption of a special hot process. It is contended that if the Page patent process, so far as producing an emulsion is concerned, is operative at all, it is because of the use of an oil which would produce an emulsion with alkali and cold water, and that the Page process may be operative without employing heat when certain oils are used but would not be operative if bitumen solid at normal temperatures was used and no heat were employed. That is, the claimant contended that the Page process would not emulsify bitumen, solid at normal temperature, because this was an impossibility in a cold process. He contended in the patent office that his claims 1 and 2 "make it clear that applicant's process is a hot process which is operative while the Page patent would be inoperative." He adds: "There is no disclosure in these lines [of the Page patent] of an emulsion product made from bitumen because Page has disclosed no operative process of making a bitumen product", etc.

The claims were again rejected on reference to the Page patent. The examiner stated that in the absence of positive proof the argument that Page's patent would not work could not be given consideration because of the prima facie operativeness of the patent. He stated that it was obvious that if Page used bitumen the latter would have to be liquified, "the preferable method as evidenced by the art being by heat". In response to this communication the patentee cancelled all claims and substituted two claims which were substantially the same as the claims finally incorporated in the patent except that the temperature was fixed at "100⁰ C" instead of 215⁰ F, as in the final claims.

It will be observed that up to this time there had been no request by the patent office for an amendment of the specifications or claims except with reference to the statement about "saponifiable material", as above mentioned, and no suggestion that if an amendment were made the claims would be allowed. On the contrary, there had been a flat rejection of all claims based upon alleged anticipation by the Page patent. The claimant had protested the rejection on the ground that the Page patent contemplated a "cold" process, presumably at atmospheric temperature, while his process was a "hot" process. This claim was entirely consistent with an intention to claim any range of temperature which might be

called "hot", at which his process would operate. The patent specifications, as amended, distinguishes the applicant's process described from that process which had been theretofore carried on in emulsifying oils, tars, etc., at 110⁰ F. In the letter accompanying the amended claims it is said: "As a matter of fact, an emulsion cannot be formed with melted asphalt and a cold aqueous alkaline solution. It is part of applicant's discovery that the solution must also be heated." These amended claims were again rejected by the patent office by a letter wherein it was stated: "The temperature of scale C in the claims is required to correspond to that set forth in the description F."

Referring to the Page process, the Commissioner again asserted: "Obviously after the addition of the alkaline to the melted bitumen the process is carried out at an elevated temperature." In response to this communication the two claims were amended so that 215⁰ F was substituted for 100⁰ C. Apparently the use of "100⁰ C" in line 38 of the specifications was overlooked and it was not changed.

Prior to the amendment just mentioned, a personal interview was granted the applicant. Nothing was said in the remarks accompanying the amendment as to the nature of the interview. It was again contended by the claimant that his discovery consisted in finding that it was not necessary to add a saponifiable material before mixing "the caustic aqueous solution and melted bitumen. * * * This may have been a discovery or invention. Whatever it was, it was unknown before applicant made it and the result has gone into extensive use." Following these amendments contained in this letter, the patent was issued.

Apparently the patent office abandoned the contention that the Page patent contemplated the melting of asphalt solid at normal temperatures for use in the process. Certainly nothing of the kind was suggested in the Page patent.

Claimant contended at all times that the Page process did not contemplate the use and emulsifying of a bitumen or asphalt which was "solid at normal temperatures". This, of course, was an obvious conclusion if it be conceded that the Page process was carried on at normal temperatures because solid asphalt would not emulsify. We see nothing in the occurrences in the patent office which would estop the claimant from a reasonable inter-

pretation of his patent claims as to temperature regardless of the specific temperature mentioned in the claims which is nowhere indicated either in the patent or by the evidence to have been a critical temperature. The only temperature change required by the patent office was one requiring the use of the Fahrenheit scale of temperature rather than the Centigrade. The patent application as originally presented, indicated that it was preferable to keep the mixture at a temperature of about $212^0$ F ($100^0$ C). In the claims allowed, the temperature is fixed at "about $215^0$" F. The appellant contends that inasmuch as the boiling point of water ($100^0$ C or $212^0$ F) is used in the specifications and the phrase, "about $215^0$ F", is used in the claims, the word "about" should be considered to cover only the temperatures ranging from $212^0$ to $215^0$ F. There is nothing in the patent file or patent itself to justify such a contention. It was not required of the claimant that he should name the entire range of temperatures at which his process would operate. The process described the use of melted asphalt which had a high degree of heat and of hot alkaline solution. Obviously, unless extraordinary precautions were taken, the temperature of such a mixture would vary in accordance with the amount and rapidity with which the asphalt was added to the hot alkaline solution and the initial temperature of that solution would change even though a system of cooling the mixture was adopted. In any event, temperatures in the mixing container during mixing would vary at different points therein from the temperature of the aqueous solution to the temperature of the melted bitumen when introduced therein. There could be no complete uniformity of temperature in the container until the process of mixing and the interchange of heat had become complete. The failure to indicate more definitely the exact temperature of the mixture during the process of agitation and the statement that it was immaterial whether the very hot asphalt was poured into the relatively cool alkaline solution, or vice versa, would indicate that exact temperatures were not considered important by the claimant.

Before determining the question of infringement, where the appellant uses much lower temperatures than those mentioned in the patent, we should inquire also as to whether or not the patent is invalidated or its construction narrowed by patents and publications relied upon by the appellant as showing anticipation.

The appellant claims that the patent in suit was anticipated by the disclosures in the following patents: Breinig, U. S. patent, 125,656, issued April 16, 1872; Anderson, U. S. patent, 775,909, issued November 29, 1904; Page, U. S. patent, 1,000,545, issued August 15, 1911; Reeve, U. S. patent, 1,408,224, issued February 28, 1922; Sahlstrom, British patent, 2,155, accepted in 1893; Vielle, British patent, 196,950, accepted May 8, 1923; deLestang, French, 438,254, published May 13, 1912. It is also claimed to be anticipated by an article entitled, "Dust Preventatives and Bituminous Binders", published April 5, 1917, in the "Canadian Engineer". An examination of these patents and of the publication referred to makes it clear that none of them provides for a process of emulsifying water with solid residual asphalt by the saponification of a portion of the latter by the use of a caustic alkali without other chemicals.

The Breinig patent does not describe the manufacture of an emulsion. The process and formula disclosed by this patent would not produce an aqueous asphalt emulsion.

The Anderson patent is entitled "method of treating roads to allay dust". This method provided for the sprinkling of the road with an emulsion comprised of 95% water and 5% oil. This patent does not describe the manufacture of an asphalt emulsion. Asphalt cannot be emulsified by the process described in the Anderson patent.

The Page patent was cited by the patent office as anticipating the specifications and claims first made by the patentee. There is nothing in the patent to indicate that the Page process dealt with a solid asphalt or with asphalt liquified by heat. The testimony shows that an asphalt emulsion such as that produced by the Montgomerie process would not be produced in carrying out the Page process. It also shows that if any emulsion was produced in the Page process it would have been of the opposite type to that produced by the process of the patent in suit. That is, an emulsion would be produced in which the water is dispersed in oil instead of the oil dispersed in water, as is done in the Montgomerie process.

The Reeve patent deals with a mixture of clay, water and bituminous material. The result is an entirely different product than that produced by the process of the

patent in suit, as it is not a stable nor a quick breaking emulsion.

The Sahlstrom patent does not deal with the emulsification of solid asphalt, but the tars, oils and hydrocarbons, such as can be emulsified at a temperature of 110° F or less. The process of emulsifying such asphalt was expressly excluded from the Montgomerie patent, lines 62–67. Moreover, the emulsion produced by this patent is an oil external mixing type.

The Vielle patent deals with the production of an emulsion of tar, oil, bitumen and pitch by the use of a colloid mill. The product produced by this process is a soap emulsion and requires the use of soap, or of soap-making materials.

The deLestang patent describes a process for the manufacture of a special type of emulsion from tar, with or without a small percentage of natural asphalt and would not be operative for the emulsifying of residuum asphalt alone.

The emulsion mentioned in the article by Parker in the Canadian Engineer does not purport to describe any process for manufacturing an asphalt emulsion. It merely refers to the use of asphalt and tar emulsions consisting of "the ordinary bituminous material with the addition of a small amount of alkali which renders the material miscible with water." This is merely a reference to such emulsions as were then on the market and in use and does not purport to describe any new or different types of emulsion, nor does it relate to the emulsification of solid asphalt. There is nothing in this article which anticipates the process of the patent in suit.

We conclude that the patent is not to be narrowly construed as to temperatures; that the patent is not anticipated; that the prior art does not limit the process except that it is to be recognized as a hot process, and that the defendant's process of emulsifying solid asphalt without the addition of fatty acids is within the hot process defined in the patent claims and infringes.

One other point requires consideration. It is contended that the appellant, in addition to the infringing process of producing an aqueous emulsion of solid asphalt by the addition of an alkali only, uses a mixture made with resin oil and that in some of its preparations and emulsions a very small amount of resin oil is used. The testimony shows that the addition of resin oil to the ingredients used by the plaintiff's process will modify the product. That is to say, the saponified material or soap and the final emulsion will be partly that produced by the reaction of the caustic alkali with the added oil and partly that produced by the reaction of the caustic alkali with the saponifiable material in the asphalt. The trial court expressed the view that the question of whether or not the process of making such an emulsion would be an infringement of appellee's patent and the amount to be recovered therefor should be left to the determination of the master on the accounting, it being expressly held by the court that emulsions formed by the addition of caustic alkali and fatty acid were not covered by the appellee's patent. It was not improper to leave this matter for the determination of the master in connection with the accounting order by the court. Riverside Heights Orange Growers' Ass'n v. Stebler, 9 Cir., 240 F. 703. Indeed, the whole matter of validity and infringement might have been referred to the master in the first instance.

The interlocutory decree is affirmed.