Walter **MARCYAN** and Marcy Gymnasium Equipment Co., a California corporation, Plaintiffs,

v.

**NISSEN CORPORATION, a Delaware corporation, and Universal Gym Equipment, Inc., a Delaware corporation, Defendants.**

No. S 80–322.

United States District Court, N.D. Indiana, South Bend Division.

July 16, 1982.

---

William N. Farabaugh, South Bend, Ind., James E. Brunton, Glendale, Cal., for plaintiffs.

Gordon D. Copelein, New York City, for defendants.

MEMORANDUM OPINION

ALLEN SHARP, Chief Judge.

I.

This will state the legal basis for the findings of fact and conclusions of law entered here.

This is an action for patent infringement brought by plaintiff, Walter Marcyan, owner of U.S. Letters Patent Re 28,066, entitled "Single Station Multi-Purpose Body Exercising Device", and his licensee, Marcy Gymnasium Equipment Company (Marcy Gym), against defendants, Nissen Corporation (Nissen) and Universal Gym Equipment, Inc. (UGEI).

Only claims 7 and 8 of the patent are asserted to be infringed by defendants' devices known as the Power-Pak Models 200 and 400 (Brunton, Tr. 29).

The main issues are the validity and infringement of claims 7 and 8. Subsidiary to the validity issue is defendants' right, in manufacturing the accused Power-Pak devices, to follow the teachings of the public domain prior art and combine with it a well-known, public domain, invertible lifting arm (or handlebar) for the usual purpose of expanding the range of exercises which can be performed. Issues of lack of candor of the patentee before the Patent Office and unfair competition (15 U.S.C. § 1125(a)) are also presented.

A two day bench trial was held on February 21–22, 1982. At trial, all discovery depositions were published and admitted into evidence.

The patentee of the patent in suit, Walter Marcyan, is an individual who resides in Glendale, California. He is president of plaintiff, Marcy Gymnasium Equipment Co., Inc. He apparently has licensed the patent, by either implied or oral agreement, to plaintiff, Marcy Gymnasium Equipment Co. who manufactures and sells various devices thereunder.

Defendants Nissen and UGEI are both Delaware corporations and both are located at Cedar Rapids, Iowa. They share some common facilities and, in some respects, common officers and employees. The Power-Pak devices here in question are manufactured at facilities in Cedar Rapids and are sold throughout the United States by defendant UGEI.

U.S. Patent Reissue 3,635,472 (Ex. 1) here in suit (hereafter '066 patent) was granted on July 9, 1974. It is based upon patent application Serial No. 328,789 filed February 1, 1973 (Ex. 21). The '066 reissue patent is an outgrowth of original U.S. Patent 6,635,472, granted January 18, 1972 based upon application Serial No. 817,729 filed April 21, 1969 (Ex. 20).

The '066 patent (Ex. 1 and the expanded drawing of Ex. 4a showing the preferred embodiment), discloses an exercise machine which is used in the manner of a conventional barbell. It has a pair of upright vertical tracks 22 and 23 and a carriage 21 having wheels, or bearings 46, at its four corners which ride in the tracks. A stack of weights 25 is connected to the carriage through a cable system 63. The weights urge the carriage in a downward direction. A trainee raises the carriage and the weights by pushing or pulling, depending on the exercise a lifting arm (handlebar) 24 upwardly (Clerk Tr. 370–371).

In the machine of the patent, the carriage always comes to rest at a predetermined position and is supported by fixed stops 36 mounted in the tracks (see patent Ex. 1, col. 3, lines 40–42) (Marcyan Tr. 134–136; Chovanes Tr. 251–252; Hall Tr. 224).

Since the starting position of the carriage is fixed by the stops 36, vertical adjustability of the lifting arm relative to the carriage must be is provided (1) to permit persons of different heights to perform the same exercise and (2) to permit a person of a given height to perform different exercises (see Figs. 10–14, and column 3, first paragraph of the patent, Ex. 1). (Marcyan, 8/17/81 Dep. 23–26, Tr. 80).

The feature constituting the alleged invention of the patent is to provide the lifting arm vertical adjustability by fitting the carriage with a plurality of vertically spaced sockets 39 (four being shown in the patent and Ex. 4a) (Chovanes Tr. 250). This permits the starting height for lifting arm 24 to be adjusted by inserting it in a selected socket. The lifting arm 24, which is of conventional shape (Marcyan, 1/26/82 Dep. 32), has: a horizontal shaft or shank portion 40 for insertion into the selected carriage socket 39; a V-shaped shoulder-contacting portion 48 which is bent with respect to the shank, through which portion the head of the trainee extends; and two horizontally extending hand grips 47. The lifting arm's vertical adjustability relative to the carriage is accomplished by inserting its horizontally extending shaft 40 into a selected one of the four vertically spaced sockets 39.

In the embodiment of Figs. 1–14 of '066, the lifting arm 24 can be inverted so that the hand grips 47 can point up instead of

their normally downward position. This feature, as discussed below, is old. Plaintiffs now maintain (Marcyan, Tr. 74 and 77) that this provides "minor" vertical adjustability. Yet the patent also discloses one other embodiment in Figs. 15–18 by which the lifting arm is adjustable vertically and is not invertible, and the file history discusses three other vertically adjustable but non-invertible alternatives (Marcyan Tr. 127–130; Chovanes 266–267, Ex. LL). Nowhere in the patent is there any disclosure of adjusting the vertical height of the lifting arm relative to the carriage solely by inverting the arm. Clearly, the thrust of the patent is the vertical adjustability by the spaced socket arrangement (Chovanes, Tr. 266).

Defendants' accused Power-Pak devices (the pertinent portion of the Models 200 and 400 are the same) is shown schematically in plaintiffs' Ex. 32. See also the photos of Exs. Z1, Z2 and Z3.

The Power-Pak has a pair of vertical uprights, or tracks. There is a carriage having wheels at its corners which ride along the tracks. The Power-Pak carriage has a single square socket into which is inserted the shank of a lifting arm or other attachment for performing different types of exercises, e.g., leg press, squat, etc. (Geist Tr. 189, 201, Exs. Z1, Z2 and Z3. To adjust the starting position for a different height person or for a different exercise, the carriage is moved relative to the uprights. As the carriage height is adjusted by moving it vertically, it carries the lifting arm with it.

The Power-Pak's lifting arm, which is of conventional bent end construction may also be inverted relative to the socket so that its hand grips point upward or downward. This arrangement permits one or two more exercises, e.g., a standing press, to be accomplished in a situation where the user is tall and/or the room height is low. (Marcyan Tr. 140).

## II.

Claims 7 and 8 are invalid for obviousness under 35 U.S.C. Sec. 103. The claims are also invalid as anticipated under 35 U.S.C. Sec. 102(b).

35 U.S.C. Sec. 102(b) states in relevant part:

A person shall be entitled to a patent unless ... (b) the invention was patented or described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States,

As to invalidity for obviousness under 35 U.S.C. Sec. 103:

A patent may not be obtained ... if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person of ordinary skill in the art to which said subject matter pertains.

The Sec. 103 obviousness ground of invalidity is discussed first.

It is settled that, while the validity of the claims under 35 U.S.C. Section 103 is a matter of law, a three-pronged factual test is to be resolved involving the: (1) scope and content of the prior art, (2) differences (if any) between the prior art and the subject matter of the claims at issue, and (3) level of ordinary skill in the pertinent art to which the alleged invention pertains. Against this background, the obviousness or non-obviousness of the subject matter is to be determined. *Graham v. John Deere & Co.*, 383 U.S. 1, 86 S.Ct. 684, 15 L.Ed.2d 545 (1966); *Harvestall v. Hochstetler*, 656 F.2d 1232, 1235 (7th Cir. 1981); *Saunders et al. v. Air-Flo Co.*, 646 F.2d 1201, 1204 (7th Cir.1981).

The prior art was considered against the backdrop of the two claims here in suit. Claims 7 and 8 contain the following basic elements, limitations or "components" (referred to by the letters of the clauses of the claims):

(a) a pair of vertical tracks,

(b) a carriage which is movable along the tracks, which carriage is supported in a

predetermined starting position for all exercises (Hall Tr. 225–227),

(c) a body engaging means (lifting arm) which extends from the carriage, the height of the body engaging means being vertically adjustable relative to the carriage. No specific shape is recited for the lifting arm (Marcyan 127),

(d) wheel (claim 7) means, or bearing (claim 8), means on the carriage which permit it to move up and down the tracks,

(e) weight means,

(f) a connection between the carriage and the weights so that the weights bias the carriage downward.

Each of the claimed elements is old and each has been used before in the exercise machine field, in the combination disclosed and claimed in the patent in suit (Chovanes, Tr. 249–250).

The prior art relief upon by defendants is discussed below using the same letters as the claim clauses for the various components.

### A. *1961 Machine—Exhibit V*

The prior art 1961 machine first appears in the file history (Ex. 21) of the application for the reissue patent in suit and a drawing appears as defendants' Ex. V. This machine was not called to the attention of the Patent Office in the application for the original patent (Ex. 20) and it does not appear on the face of the patent in suit as a "cited reference", so there is no indication that it was considered by the Patent Office during the prosecution of the reissue application (Hall, Tr. 228–229; see also Chovanes, Tr. 304–305).

The 1961 machine was designed, built and sold by the patentee of the patent in suit, Mr. Marcyan (Marcyan Tr. 101–102).

Mr. Clark testified with respect to the 1961 machine (Clark, Tr. 338–344). By referring to Exhibit V, he showed that the 1961 machine included the following: the various upper case letters were added to Exhibit V by Mr. Clark during his testimony:

(a) a pair of vertical tracks (A),

(b) a carriage formed by a slide (B) moving on each track and a connection (D) between the slides; each slide was supported in a predetermined starting position for each exercise by a stop (C) at the bottom of each track,

(c) a body engaging means (D) in the form of a lifting arm, this arm is disposed forward of the tracks. Each of the slides has a number of keyhold slots (E) so that the height of the lifting arm (D) can be adjusted relative to the slides (carriage),

(d) bearing means provided by the interiors of the slides themselves,

(e) a stack of weights (F),

(f) a cable system (G) connecting the carriage and the weight stack (the stack biases the carriage downwardly).

### B. *Newbrough Patent 169,467—Exhibit H Granted November 2, 1875*

This patent was issued over 100 years ago. The testimony (Clark, Tr. 332–339) was that it includes the following:

(a) a supporting structure including base A and tracks $a$ with slots $e$,

(b) a carriage (bar C) moving in a straight line along the tracks $a$. The carriage C is always at a predetermined starting height relative to the tracks since it rests against the lower ends of the slots e,

(c) there is a body engaging means in the form of a handle D having a split rod E the lower part of which embraces the carriage C. The height of the handle is adjustable vertically relative to the carriage (see Fig. 1). This is accomplished by removing the pull pin d, moving the handle assembly up or down and then reinserting the pin into the holes in the forked part of the handle assembly and the carriage. This locks the handle assembly at a different height relative to the carriage C,

(d) there are bearing means in that the faces of the carriage C bear against the portions of the upright tracks $a$ defining the slots e,

(e) bands or springs *m* provide a resistive force. These are the equivalent of weights,

(f) the bands *m* are connected to the carriage and bias it downwardly.

## C. *French Patent 1,444,065—Exhibit N (marked copy) Published May 23, 1966*

This patent was discussed in detail by Mr. Chovanes (Tr. 244–250). Mr. Clark was in Court during the testimony of Mr. Chovanes and agreed with his analysis of the patent (Clark Tr. 344).

This patent shows an exercise machine which has:

(a) a pair of vertical tracks 1,

(b) a carriage 4 which moves up and down the tracks,

(c) a body engaging means having handles (marked A) which project laterally outwardly for engagement by the trainee,

(d) wheels, or bearings, 8 at each corner so that the carriage can move along the tracks,

(e) and (f) weights 5 which are connected to the carriage to bias it downwardly.

To perform different exercises on this machine, the trainee uses stop pins 3 placed in holes 2 and the tracks 1, to set the height of the carriage relative to the tracks. This is basically the same concept and arrangement used in defendants' Power-Pak (Chovanes Tr. 249–250 and 272).

The French patent also goes to great lengths in describing various wheel and track configurations (Figs. 2, 3 and 4 of Ex. N) to prevent the carriage from binding as it moves along the tracks (Chovanes Tr. 293–294).

No prior art before the Patent Office during the prosecution of the applications for the '066 patent shows an invertible lifting arm or handlebar. (Marcyan, Tr. 131–133). The evidence, introduced at trial, shows invertible lifting arms on three different exercise machines and used in various other devices.

## D. *Silver Tiger and Emperor—Exhibits P and Q*

These exhibits show exercise devices which have a lifting arm which can be inverted from a position in which the hand grips point upwardly (see picture in upper right hand corner) to one in which the grips point downwardly (see picture in lower right center). The purpose of the invertibility is to increase the range of exercises which can be performed (Clark Tr. 328–329).

These devices which were sold in 1968 by plaintiff Marcy Gym before Marcyan made the invention of the '066 patent and/or more than a year prior to the filing date of the original application for the '066 patent (Marcyan Tr. 94–97, 131–133). Marcyan candidly admitted that while he obviously knew of these devices, he did not call either one to the attention of the Patent Office (Marcyan, Tr. 96–97).

## E. *Invertible Handlebars on Universal Exercise Machines*

In about 1965, the predecessor of defendant UGEI made and sold exercise machines which had an invertible lifting arm. Mr. Coker, upon being deposed by plaintiffs, drew a picture of one such device (Coker Dep. 18–19, 38; Ex. U). Mr. Clark independently corroborated this (Clark Tr. 331, 354).

## F. *Exercycle Device—Exhibit M–2*

This well-known bicycle exercise device dates back to 1932. It employs an invertible handlebar available to change the height at which the trainee grips the hand grips so as to vary the range of exercises which can be performed (Clark Tr. 329).

## G. *U.S. Patent 3,655—Chapman—Exhibit K*

This shows an exercise device having a stick 22 on which a movable weight 24 is located. A bend handlebar 40 is mounted on one end of the stick. The handlebar may be inverted so that different types of exercises may be performed—compare

Figs. 1 and 2 as well as Fig. 8 which shows the invertibility (Clark Tr. 329–330).

### H. *Bicycle Handlebars*

■ Judicial notice should be taken (Fed. R.Evid. 201) of the fact that handlebars of a bicycle are routinely inverted, and have been inverted by bicycle riders for a long period of time, to achieve a range in their height.

■ On deposition the patentee of the '066 patent admitted that the feature of an invertible handlebar, by itself, was not new or inventive in an exercising machine. (Marcyan, 8/17/81 Dep. 33–34; Marcyan 1/26/81 Dep. 33).

In considering this portion of the *Graham v. Deere* test, it is the words of the claims which the Court should consider since the patentee elected to use them to define his alleged invention. *McClain v. Ortmayer*, 141 U.S. 419, 423–24, 12 S.Ct. 76, 77, 35 L.Ed. 800 (1891); *Super Products v. D P Way Corp.*, 546 F.2d 748–756 (7th Cir.1976).

It should be understood that neither claim 7 nor claim 8 recites any specific shape for the lifting arm. (Marcyan Tr. 127). They merely call for "body engaging means." Thus, for obviousness and anticipation purposes, any shape prior art lifting arm will suffice.

There is no difference between the 1961 machine and the recited elements of claim 8 (Clark Tr. 339–344). That is, the 1961 machine contains a component corresponding to each of the clauses of claim 8 and meeting every term of the clause.

As noted above, *supra,* page 12, the only difference between claims 7 and 8 is that the former calls for "wheel means" attached to the carriage rather than for "bearing means". A bearing and a wheel are equivalents since they permit the carriage to move up and down along the tracks. Both had been used interchangeably on exercise devices for long periods of time (Clark Tr. 338–339, 344). It does not amount to patentable invention to substitute one for the other.

As testified to by Mr. Clark (Clark Tr. 331–339), every recited element of claim 8 is found in Newbrough. Newbrough uses elastic bands to provide a resistive force to bias (urge) the carriage downwardly. Such elastic bands have been used as a resistive force and are the equivalents of elements such as weights, springs, etc. (Clark Tr. 337–338). Therefore, they satisfy the claimed "weight means"/average. As to claim 8, Newbrough has bearing surfaces in which the carriage C rides (Clark Tr. 336–337). For claim 7, the recited "wheel means" are the equivalent of the "bearing means" of Newbrough (Clark Tr. 338–339).

Since it was built in 1875, over 100 years ago, the Newbrough machine does not look like the present day exercise devices. Yet, it incorporates the same elements as found in the '006 patent. Most importantly, it uses a lifting arm whose height is vertically adjustable to perform a range of exercises.

As will be shown in section 5, *infra,* Newbrough is also an anticipating reference (35 U.S.C. Sec. 102) with respect to claims 7 and 8.

The structure of defendants' accused Power-Pak device parallels that of the French patent (Chovanes, Tr. 249–250, 272). In the French patent, unlike the machine of the '066 patent, the carriage is not supported at a predetermined starting position for all exercises. The starting position of the carriage for a given exercise and/or for trainees of different height) is set by moving the pins 3 in the tracks under the carriage to set the carriage at a given height relative to the track (this is the absolute height or height above the ground).

Thus, the French patent has no lifting arm which is vertically adjustable relative to the carriage. Instead, the French patent adjusts the absolute height of the carriage. This arrangement for varying the height of the carriage above the ground corresponds to the arrangement used by defendants in the accused Power-Pak (Chovanes, Tr. 249–250, 272).

The handles "A" of the French patent are not invertible.

If plaintiffs urge here, as was urged in the application for the reissue patent '066 (Ex. 21), that preventing the binding of a carriage is novel, then the French patent obviously negates this since this patent shows a variety of ways for preventing binding of the carriage on the tracks (Clark, Tr. 368).

Defendants proved the prior existence of four different exercise devices which utilized an invertible lifting arm. These were plaintiffs' own Silver Tiger and Emperor devices (not disclosed to the Patent Office), the 1965 Universal machine, and the Exercycle device. Each shows that it is a well-known expedient in the exercise art to use an invertible lifting arm for height adjustment to increase the range of exercises that can be performed.

In summary, all of the features of claims 7 and 8, i.e., tracks, carriage, lifting arm, weights and connections between the weights and carriage, are shown in the prior art.

The pertinent art is the field of exercise devices. While defendants could have urged that any art is pertinent in which an operating arm or any other expedient is used for height adjustment (this expands the scope of the art available for use as prior art), it was not necessary to do so. The exercise device art itself shows this and all other necessary features.

■ Defendants also submit that the level of ordinary skill in the art should be that of a designer working in the art of designing exercise machines. Such persons would have a knowledge of exercise devices of the type shown in the prior art patents as well as others. They would also have expertise with the mechanical devices, couplings, etc. used in such machines.

Defendants' witness Mr. Clark was obviously a person who satisfied these requirements. While not possessing a college engineering degree, he had practical experience in developing various types of exercise equipment (Ironco) which had found recognition in the exercise field (Clark, Tr. 323–327; 346–351). A person with a higher level of educational training, e.g., a mechanical engineer, possibly could have added even further examples of invertible handlebars, use of tracks, carriages, etc., to show obviousness, but this was unnecessary. Defendants' other witnesses, Coker, Geist and Chovanes, also displayed knowledge of the art.

■ At trial, plaintiffs submitted no independent testimony on the issue of unobviousness with respect to defendants' prior art. They appeared to rely only on the statutory presumption of validity 35 U.S.C. Sec. 282. In discussing this presumption, in *Republic Industries v. Schlage, infra,* at 592 F.2d 963, 972, the Court of Appeals for the Seventh Circuit stated:

We begin this analysis by noting that a patent is presumed valid. 35 U.S.C. Sec. 282. That presumption, however, is not conclusive, *St. Regis Paper Co. v. Bemis Co.,* 549 F.2d 833, 838 (7th Cir.), cert. denied, 434 U.S. 833, 98 S.Ct. 119, 54 L.Ed.2d 94 (1977); it merely shifts the burden of proof to the party attacking the validity of the patent. *Maxon Premix Burner Co. v. Eclipse Fuel Engineering Co.,* 471 F.2d 308, 312 (7th Cir. 1972), cert. denied, 410 U.S. 929, 93 S.Ct. 1365, 35 L.Ed.2d 591 (1973). Furthermore, that presumption does not exist against evidence of prior art not before the Patent Office. *The Allen Group v. Nu-Star, Inc.,* 575 F.2d 146 (7th Cir.1978) (per curiam); *Ropat Corp. v. McGraw Edison Co.,* 535 F.2d 378, 383 (7th Cir. 1976). "Even one prior art reference not considered by the Patent Office can suffice to overthrow the presumption." *Henry Manufacturing Co. v. Commercial Filters Corp.,* 489 F.2d 1008, 1013 (7th Cir.1972)."

Here, all of the prior art reference relied upon by defendants were not considered by the Patent Office. Thus, they conclusively overcome the presumption of validity.

Plaintiffs may argue that the 1961 machine was disclosed to the Patent Office by their submission in the file history of the

reissue application (Ex. 21). However, there is no proof that the 1961 machine was considered by the Patent Office since it is absent from the list of "Reference Cited" at the end of the patent (column 5 of Ex. 1). That is, the Patent Examiner may never have considered this device (Hall, Tr. 228–229; see also, Chovanes Tr. 304–305). Even plaintiffs' patent expert agreed that there was no guarantee that the Examiner had considered the 1961 machine (Hall, Tr. 228–229). Therefore, the 1961 machine can be considered as a reference which can destroy the presumption of validity. See *Medical Laboratory Automation v. Labcon Inc.,* 500 F.Supp. 54, 58 (N.D.Ill.1980); *Mooney v. Brunswick Corp.,* 212 USPQ 401, 407 (7th Cir.1981).

The patent in suit has no presumption of validity and it is invalid for not meeting the statutory tests for patentability.

Evidence on each of the three factual tests required by *Graham v. Deere* was presented at trial

■ The claims cover a device which is an assemblage of old elements, each of which operates in its known and intended manner (Clark Tr. 331–334). Synergism is not necessary for patentability. *Republic Industries, Inc. v. Schlage Lock Co.,* 592 F.2d 963 (7th Cir.1979). However, the court in *Republic,* a case which held a patent for a combination of old elements unpatentable for obviousness, stated at page 972:

Perhaps *a caveat* is in order: by our holding today we have no intention of departing from the high standard of patentability which is reflected in the *Black Rock* [*v. Pavement Co.,* 396 U.S. 57, 90 S.Ct. 305, 24 L.Ed.2d 258 (1969)] and *Sakraida* decisions. Though rendered nearly a century ago, the Supreme Court's discussion in *Atlantic Works v. Brady,* 107 U.S. 192, 200, 2 S.Ct. 225, 231, 27 L.Ed. 438 (1883), of the purpose behind the patent laws remains true today: The design of the patent laws is to reward those who make some substantial discovery or invention, which adds to our knowledge and makes a step in advance in the useful arts. Such inventors are worthy of all favor. It was never the object of those laws to grant a monopoly for every trifling device, every shadow of a shade of an idea, which would naturally and spontaneously occur to any skilled mechanic or operator in the ordinary progress of manufactures. Such an indiscriminate creation of exclusive privileges tends rather to obstruct than to stimulate invention .... It embarrasses the honest pursuit of business with fears and apprehensions of concealed liens and unknown liabilities of lawsuits and vexatious accountings for profits made in good faith.

At footnote 25 on the same page, the Court of Appeals also stated that:

The Supreme Court has expressed this idea in similar terms: "Courts should scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding (a patentable) invention in an assembly of old elements..." *Great A & P Tea Co. v. Supermarket Corp.,* 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950). *Accord, Sakraida v. Ag Pro, Inc.,* 425 U.S. 273, 281, 96 S.Ct. 1532, 47 L.Ed.2d 784 (1976).

There is nothing in claims 7 and 8 that amounts to patentable invention within the meaning of 35 U.S.C. Sec. 103.

Considering first the 1961 machine as to claim 8, which recites the "bearing means", Mr. Clark found each and every element present. The only different structure insofar as claim 7 is concerned is the use of "wheel means" instead of "bearing means". Wheels and bearings are well-known elements which are equivalent for purposes of permitting one member (the carriage) to move relative to the other. The prior art French patent (Ex. N, showing wheels) demonstrates the interchangeability.

Of significant importance, as testified to by Mr. Clark, is that the lifting arm of each of the 1961 machine and the 1875 Newbrough patent was vertically adjustable to

achieve a selected starting height for different exercises (Clark Tr. 335–336; 342–343; 366). No prior art showing this feature, which plaintiffs allege as being quite important to patentability, appears to have been considered by the Patent Office.

On cross-examination of Mr. Clark, plaintiffs attempted to show that the two slides B and connecting lifting arm D of the 1961 machine did not form a carriage. Yet, Clark testified that either one or both slides could be considered a carriage. (Clark Tr. 364).

Plaintiffs did not attempt to challenge Mr. Clark's testimony that the lifting arm of the 1961 machine produced an eccentric force as recited in claims 7 and 8. This was one of the major reasons for Marcyan seeking the '066 reissue patent. In this connection see the italicized (added) portion of claim 1 (Ex. 1), the reissue declaration in the application for the reissue patent (Ex. 20) (Chovanes, Tr. 293–294; Hall, Tr. 223). This provides further evidence that the Patent Examiner did not consider the 1961 machine and that there is nothing novel in the claims.

All of the elements of the claims were present in the 1961 machine. While there may be differences between what is shown in the drawings of the '066 patent and the 1961 machine, these are differences only in minor mechanical features, which form no part of the claimed subject matter. The broad concepts of the 1961 machine and the patented machine are the same: a carriage rides on vertical tracks to raise weights as the carriage is lifted, and a lifting arm which is operated to move the carriage is adjustable in height relative to the carriage. It is only this broad concept of the machine which could lend patentability to claims 7 and 8, and the terms of the claims are satisfied by the 1961 machine. Therefore, the claims are invalid over this machine.

Insofar as the 1875 Newbrough patent (Ex. B) is concerned, while the device of that patent may not look like the device shown in the '066 patent, the concepts of both are the same. More importantly, the Newbrough patent is totally applicable to establish a holding of obviousness against the broad language of the claims, which define the intended scope of the invention.

■ The only difference between Newbrough and Claim 8 is the use of elastic bands for the equivalent weights as the resistive force and downward biasing means for the carriage. The substitution of weights for the elastic bands of Newbrough would not amount to patentable invention. As to claim 7, Clark testified to the well-known interchangeability and equivalence of a wheel and a sliding bearing, such as used by Newbrough. Here again, the claims are unpatentable.

■ Defendants' Power-Pak machine accused of infringement and the machine of the French patent 1,444,065 (Ex. N) are quite similar. Both adjust the absolute height of the carriage relative to the tracks and the ground. Plaintiffs cannot contend that merely adjusting the height of a carriage relative to the tracks, as in the prior art French patent, makes the Power-Pak an infringing structure. If this approach is pursued, then the French patent is a direct anticipation of the claims, since it also provides the same type of height selection of the carriage relative to the tracks as in the Power-Pak. If defendants' Power-Pak infringes merely because of its adjustable carriage, then a device built according to the French patent would also infringe. The French patent then becomes an anticipating reference under 35 U.S.C. Sec. 102(b) because it is an elemental principle of patent law that a structure in a prior art reference which would infringe the patent if later in time, anticipates it if earlier in time. *Knapp v. Morss*, 150 U.S. 221, 228, 14 S.Ct. 81, 84, 37 L.Ed. 1059 (1893); *American Fruit Growers, Inc. v. Brogdex* 283 U.S. 1, 51 S.Ct. 328, 75 L.Ed. 801 (1931).

Plaintiffs appear to pursue a narrower construction of claims 7 and 8 to save them from anticipation by the French patent. They take the position that the invertibility of the lifting arm of defendants' Power-

Pak provides the adjustment of the height of the lifting arm relative to the carriage called for in each of the claims. That is, plaintiffs clearly admit that except for the invertibility of the lifting arm, that defendants are building a prior art, public domain machine.

Inverting a handlebar in an exercise machine to increase the exercise range is an old and well-known expedient. Plaintiffs used this in their prior art Silver Tiger and Emperor machines; the plaintiff-patentee admitted that this feature, by itself, was old; it was used in other exercise machines as a common expedient; it was known in the Exercycle device (Ex. MM–2) since the 1930's.

The claims as construed by plaintiffs to cover defendants Power-Pak recite only the same (old) combination of elements shown in the French patent exercise machine, the only difference being the addition of the well-known invertible lifting arm. If the claim is claiming only this old prior art feature, then it is invalid. See *Super Products Corporation v. D P Way Corporation*, 546 F.2d 748, 755–57 (7th Cir.1976). There, a combination claim was in issue and the only new feature was a particular kind of filter, the prior art Mikro-Pulsaire Dust Collector, which was old (it was not disclosed to the Patent Office by the patentee). The Court found that the alleged invention claimed was the filter and that, since this was old, the claim was invalid. The same applies in the present instance, where the alleged new feature (vis-a-vis defendants' Power-Pak as considered in light of the prior art French patent) is the invertible lifting arm. This was also old, so the claims are similarly invalid.

Mr. Clark's testimony on obviousness was clear, concise, and convincing. He analyzed each element of the claims against the prior art 1961 machine and the Newbrough patent and either found them present or found the differences to be obvious. This renders the claims invalid. He also testified that it would be obvious to fit the French machine with the well-known invertible handlebar, if this was desired.

This renders the claims invalid even if construed in the limited manner now asserted by plaintiffs and not contemplated by the patent.

Mr. Clark's testimony was uncontradicted. The correct legal conclusion to reach is one of obviousness and invalidity. See *Systematic Tool and Machine Company v. Walter Kidde & Company, Inc.*, 555 F.2d 342 (3d Cir.1977) at page 350.

As is the rule in this Circuit:

(a) previous patent ... anticipates a purported invention only where, except for unsubstantial differences, it contains all of the same elements operating in the same fashion to produce an identical function.

See *Popeil Brothers Inc. v. Schick Electric Inc.*, 494 F.2d 162, 164 (7th Cir.1974); *Reynolds Metals Co. v. Aluminum Co. of America*, 609 F.2d 1218, 1220 (7th Cir. 1979), *cert. den.*, 446 U.S. 989, 100 S.Ct. 2976, 64 L.Ed.2d 847 (1980); *Saunders v. Air-Flo*, 646 F.2d 1201 (7th Cir.1981).

The 1961 machine is an anticipating reference, under 35 U.S.C. Sec. 102(b), against claims 7 and 8. Mr. Clark found each and every element of claim 8 present in the 1961 machine. (Clark Tr. 338–344). Claim 8 only calls for (a) tracks, (b) a carriage, (c) an adjustable lifting arm, (d) bearings for the carriage, (e) weight means, and (f) a connection between the weight and the carriage—all of these being found in the 1961 machine.

The result produced by the 1961 exercise machine is the same as that of the exercise machine of the claim 8, i.e., the weights are lifted as the carriage is moved and the lifting arm is vertically adjustable relative to the carriage. Therefore, claim 8 is anticipated under 35 U.S.C. Sec. 102(b).

The only relevant difference between claims 7 and 8 is that the former recites "wheel means" instead of "bearing means". Plaintiffs' use of the term "wheel means" instead of "wheels" evidences the intention to use the broader "means plus function" language sanctioned by the last

paragraph of 35 U.S.C. Sec. 112, which provides:

An element in a claim for a combination may be expressed as a means or step for performing a specified function without the recital of structure, material, or acts in support thereof, and such claim shall be construed to cover the corresponding structure, material, or acts described in the specification and equivalents thereof.

As discussed previously defendants have proven that the slide structure of the 1961 machine is equivalent to using wheels, so that it comes under the term "wheel means" and claim 7 is anticipated by the 1961 machine.

In addition, plaintiffs have shown that the Newbrough patent uses elastic bands in place of weights. However, claim 8 uses the term "weight means" and it was proven that the elastic bands are equivalent to weights. Hence, the language "weight means" is satisfied by elastic bands and claim 8 is anticipated by the Newbrough patent.

Similarly, defendants have shown that the bearing surfaces of the Newbrough patent are equivalent to wheels. Hence, "wheel means" are present and the Newbrough patent anticipates claim 7.

 The patent in suit is a reissue patent. Therefore, it must satisfy certain statutory requirements (e.g., 35 U.S.C. Sec. 251). An application for a reissue patent may not contain "new matter" and must be addressed to the same invention as the original patent. Although, in considering non-infringement below, defendants made the assumption that these requirements were met, this is not the case if limitations (e.g., the stops 36) which are not explicitly in the claims are not to be read into them. Plaintiffs, however, oppose such a construction of the claims. Thus, the claims are addressed to a different invention and/or new matter and are invalid.

██ Furthermore, the original declaration for the reissue application was improper in that it was misleading and untruthful. The declaration stated that the purpose of the reissue application was to correct certain errors regarding the scope of the claims. Ostensibly, the correction was to cover certain "equivalents" for the structure of the carriage which reduced the eccentric forces produced when the lifting arm is raised. Yet, reissue claims 7 and 8 excluded the stops (36) which prevent the carriage from going below a present starting height and used different terminology (the plaintiffs have conceded, at Tr. 227, that this terminology is broader and therefore encompasses more than the original disclosure). This was not mentioned in the declaration. Had it been, it is likely that the reissue patent would never have been granted.

### III.

The accused Power-Pak devices are exercising machines on which a trainee may perform various lifting exercises by applying an upward force to a vertically slideable carriage connected to lift a variable weight stack. To accommodate trainees of different height and/or to permit a trainee to perform exercises which require different starting heights for the lift, the carriage is coupled to the weight stack through a vertical selector shaft having vertically spaced holes. The carriage connection to the shaft and its starting height adjustment are achieved by a spring-loaded pin on the carriage which is inserted into a selected one of the holes (at a desired height).

A trainee lifts the carriage by using of any one of a plurality of selectively interchangeable attachments which mount in a socket at the front of the carriage so as to project outwardly for access by a trainee. The various attachments permit effective performance of different exercises (Geist, Tr. 201–202; Ex. Z1, Z2, Z3).

One of these attachments is a generally Y-shaped lifting arm, having a horizontal shank portion that is received in the socket. A horizontal cross-piece is attached perpendicular to the shank at its forward end. An angled arm projects forwardly from each end of the cross-piece and terminates

in an outwardly directed hand grip, which is parallel to the cross-piece. The arm portions are angled so as to lie in a plane which is inclined with respect to the shank (Ex. Z1). This permits the lifting arm to be inserted into the socket in either of two positions: with the bent arm portions pointed either up or down. This is referred to as "inversion" or "invertibility".

In contrast to the accused Power-Pak devices, the patent in suit discloses an exercise machine in which the carriage is always in the same fixed starting position as a result of permanent stops which prevent it from moving below that position (Marcyan, Tr. 134–135; Chovanes, Tr. 251–252). Height adjustment of a Y-shaped bent lifting arm is achieved by moving the entire arm vertically with respect to the carriage and then inserting it into one of the sockets on the carriage. This is necessary, because the carriage is always in a fixed starting position (Chovanes, Tr. 252). The bent lifting arm is also invertible to achieve a starting height adjustment.

■ Defendants are accused of infringing only claims 7 and 8 of the patent in suit (Tr. 29) which, in all relevant respects, are identical (Tr. 31). Both claims recite "carriage ... supported in a predetermined starting position" and "body-engaging means" which is "vertically adjustable relative to said carriage". The meaning of these clauses and their application to the accused Power-Pak structure are at the center of the dispute as to the question of patent infringement.

An American patent is a written contract between the inventor and the government .... The consideration given on the part of the inventor to the government is the disclosure of his invention.... The consideration on the part of the government given to the patentee for the disclosure is a monopoly for seventeen years of the invention of the extent of the claims allowed in the patent. *Krupp A.G. v. Midvale Steel Co.*, 191 F. 588 (3d Cir.1911); *Catanzaro v. Masco*, 423 F.Supp. 415, 431 (D.Del.1976), *aff'd.*, 575 F.2d 1085 (3d Cir.1978), *cert. den.*, 439 U.S. 989, 99 S.Ct. 586, 58 L.Ed.2d 662 (1978). It is subject to the same general rules of construction as other contracts. *Goodyear Dental Vulcanite Co. v. Davis*, 102 U.S. 222, 26 L.Ed. 149 (1880).

The scope of every patent is limited to the invention described in the claims contained in it, read in the light of the specification. These so mark where the progress claimed by the patent begins and where it ends that they have been aptly likened to the description in a deed, which sets the bounds to the grant which it contains. It is to the claims of every patent, therefore, that we must turn when we are seeking to determine what the invention is, the exclusive use of which is given to the inventor by the grant provided for by the statute,—"he can claim nothing beyond them."

*Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243 U.S. 502, 510, 37 S.Ct. 416, 418, 61 L.Ed. 871 (1917); *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966).

The rights of the plaintiff depend upon the claim in his patent, according to its proper construction, and not upon what he may erroneously suppose it covers.

*McClain v. Ortmayer*, 141 U.S. 419, 425, 12 S.Ct. 76, 78, 35 L.Ed. 800 (1891).

■ Inasmuch as "the plaintiff's rights depend upon the claim in his patent according to its proper construction", *McClain v. Ortmayer, supra*, the Court must construe the claims to determine the scope of a patent's protection before it can make a determination on the question of infringement.

We have said that the "guiding star" in construction of a patent is the phraseology the applicant employed in his claim. *Texas Co. v. Globe Oil & Refining Co.*, 225 F.2d 725, 729 (7th Cir.1955). While the language of the claim must be read in light of the specification and the file wrapper, *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684 [701], 15 L.Ed.2d 545 (1966); *Ortho Pharmaceutical Corp. v. American Hospital Supply Corp.*, 534 F.2d 89, 94 (7th Cir.1976), the

claim alone is the measure of the invention, *Aro Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339, 81 S.Ct. 599 [600], 5 L.Ed.2d 592 (1965); *Laser Alignment, Inc. v. Woodruff & Sons, Inc.*, 491 F.2d 866, 872 (7th Cir.), cert. denied, 419 U.S. 874, 95 S.Ct. 135, 42 L.Ed.2d 113 (1974).

*Super Products Corp. v. D P Way Corp.*, 546 F.2d 748, 756 (7th Cir.1976). The law in this jurisdiction and the mandate of the Supreme Court is that the file history of a patent must be considered, in addition to the patent itself, in construing the claims.

 It is well established that the specification of a patent is available to limit the scope of a claim, but not to expand it, as demonstrated by the opinion in *McClain v. Ortmayer*, 141 U.S. 419, 424–5, 12 S.Ct. 76, 77–8, 35 L.Ed. 800 (1891):

> While the patentee may have been unfortunate in the language he has chosen to express his actual invention, and may have been entitled to a broader claim, we are not at liberty, without running counter to the entire current of authority in this court, to construe such claims to include more than their language fairly imports. Nothing is better settled in the law of patents than that the patentee may claim the whole or only a part of his invention, and that if he only describe and claim a part, he is presumed to have abandoned the residue to the public.... The claim is the measure of his right to relief and while the specification may be referred to limit the claim, it can never be made available to expand it ... If the patentees have not claimed the whole of their invention and the omission has been the result of inadvertence, they should have sought to correct the error by a surrender of their patent and an application for a reissue.

and *Super Products Corp. v. D P Way Corp., supra*, at 756:

> The monopoly granted to the inventor can never be broader than the invention disclosed to the public, and, while the specification and the file wrapper may limit a claim or serve to resolve an ambiguity in it, they may not be used to enlarge the claim. See *Bendix Corp. v. Balax, Inc.*, 421 F.2d 809, 813 (7th Cir.), cert. denied, 399 U.S. 911, 90 S.Ct. 2203, 26 L.Ed.2d 562 (1970); *Del Francia v. Stanthony Corp.*, 278 F.2d 745, 747 (9th Cir.1960).

The role of the file history of a patent in claim construction has been clearly and consistently defined by the Supreme Court

> (W)here an applicant whose claim is rejected on reference to a prior patent, without objection or appeal, voluntarily restricts himself by an amendment of his claim to a specific structure, having thus narrowed his claim in order to obtain a patent, he "may not by construction or by resort to the doctrine of equivalents, give to the claim the larger scope which it might have had without the amendments which amount to a disclaimer.

*I.T.S. Rubber Co. v. Essex Rubber Co.*, 272 U.S. 429, 444, 47 S.Ct. 136, 141, 71 L.Ed. 335 (1926). As stated in *Graham v. John Deere Co.*, 383 U.S. 1, 33, 86 S.Ct. 684, 701, 15 L.Ed.2d 545 (1966):

> Claims as allowed must be read and interpreted with reference to rejected ones and to the state of the prior art. Claims that have been narrowed in order to obtain the issuance of a patent by distinguishing the prior art cannot be sustained to cover that which was previously by limitation eliminated from the patent. A patentee cannot be permitted to recover what he lost in the Patent Office proceedings.

In *Arco Industries Corp. v. Chemcast Corp.*, 633 F.2d 435, 439 (6th Cir.1980), the court, after citing the preceding quote from *Graham*, stated that "Although this use of the file wrapper history is termed a rule of patent construction and not an estoppel, there is little practical difference in result."

The *Arco* case correctly recognizes the role of the file history in claim construction. It also points out that there is no real difference between the application of the file history to construe claims and under the doctrine of file wrapper estoppel (as did

the *I.T.S.* case) which is traditionally applied when the doctrine of equivalents is invoked. The identical effect of application of the file history in the two different situations has let many courts to use the term "file wrapper estoppel" in both situations. For example, the court in *Bendix Corp. v. United States*, 199 USPQ 203 (Ct.Cl.1978), held that:

> The well-known doctrine of file wrapper estoppel may be applied to restrict the scope of claims which might otherwise be given broad semantic construction or by wrapper estoppel, therefore, normally may operate to restrict the literal scope of claims as well as to limit application of the doctrine of equivalents in applying the claims to an accused device. There is no doubt that use of restrictive or narrowing terminology in the claims to overcome cited prior art precludes the patentee from urging a broader interpretation than the language of the claims allows.

That the Seventh Circuit Court of Appeals applies file wrapper estoppel in claim construction can be appreciated from the quotes from *Super Products Corp. v. D P Way Corp., supra*, which quotes treat the specification or file wrapper equally regarding claim construction.

■ Furthermore, statement made by an applicant's attorney in the course of an amendment in order to achieve allowance of claims have the effect of a file wrapper estoppel. *Barrel Fitting & Seal Corp. of America v. American Flange Mfg. Co.*, 74 F.2d 569 (7th Cir.1935); *Sager v. Glove Corp.*, 118 F.2d 873 (7th Cir.1941). See also, *Scheller-Globe Corp. v. Milsco Manufacturing Co.*, 206 U.S.P.Q. 42 (E.D.Wis. 1979); *modified*, 636 F.2d 177 (1980); *Biuro Projectow v. UOP, Inc.*, 203 USPQ 175 (N.D.Ill.1979). In *Scheller-Globe*, the district court relied entirely on statements made by the attorney during prosecution. The attorney stressed that a prior art reference required a heating step, whereas the applicant's concept required cooling. As a result, the court held that one who uses

heating does not infringe. *Scheller-Globe* at 206 USPQ 52–53.

However, whether or not the terminology "file wrapper estoppel" is employed, it is settled that the claims must be construed and limited in view of the file history, and that the same result is to be achieved whether the claims are being construed or whether traditional file wrapper estoppel (i.e., in the doctrine of equivalents situation) is applied.

"Words used in a patent should be given their ordinary and accustomed meaning unless it specifically appears from the patent that the inventor attached some different specific meaning to the word or words." *Universal Oil Products Co. v. Globe Oil Refining Co.*, 137 F.2d 3, 6 (7th Cir.1943), *aff'd*, 322 U.S. 471, 64 S.Ct. 1110, 88 L.Ed. 1399 (1944); *Aircraftsmen, Inc. v. Aircraft Equipment Co.*, 247 F.Supp. 469, 477–478, *aff'd*, 383 F.2d 988 (5th Cir.1967); *Godfrey L. Cabot, Inc., v. J.N. Huber Corp.*, 127 F.2d 805, 807 (5th Cir.1942).

In the *Universal Oil Products case*, the court also stated:

> Moreover, the meaning which the inventor gives to his words cannot be made to depend upon subsequent events but should appear when the application is filed. For example, an Applicant who used words of common meaning and finds they do not cover a subsequently created structure will not be permitted to place a new or different meaning that will cover said subsequently appearing structure.

■ Where the claims define a narrow invention in a crowded art, the claims are to be limited to the precise structure disclosed and claimed. *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 67 S.Ct. 6, 91 L.Ed. 3 (1946); *Kennatrack Corp. v. Stanley Works*, 314 F.2d 164 (7th Cir.1963); *Tillotson Mfg. Co. v. Textron, Inc.*, 337 F.2d 833 (6th Cir.1964).

■ The art to which the '066 patent pertains is one which is relatively crowded and, therefore, the claims are entitled only to a narrow construction.

The requirements for determining "literal" infringement were set forth by the court in *Huck Manufacturing Co. v. Textron, Inc.,* 187 USPQ 388, 408 (E.D. Mich.1975), as conclusion of law number 21:

> When an accused device falls literally within the language of a patent claim and is an equivalent of the patented rivet, the patent has been infringed.

Thus, a "literal" infringement requires more than a blind reading of the terms of the claims on the accused structure. It also requires that the accused structure be equivalent to that disclosed in the patent.

The Seventh Circuit Court of Appeals is in clear agreement with this two component test. See *Mooney v. Brunswick Corp.,* 663 F.2d 724, 212 USPQ 401 (7th Cir.1981), where the court stated at 212 USPQ 411, that:

> In order to prove infringement, the plaintiff must demonstrate that defendant engaged in the "unauthorized performance of substantially the same process steps in substantially the same way to accommodate substantially the same result." *International Glass Co. v. United States,* 408 F.2d 395, 400, 159 USPQ 434, 438–439 (Ct.Cl.1969). See *Tilghman v. Proctor,* 102 U.S. 707 [26 L.Ed. 279] (1881). It is not enough that the defendant produce the same result. Infringement occurs only when both the method and the result are substantially the same. See *Linde Air Products Co. v. Graver Tank & Manufacturing Co.,* 167 F.2d 531, 77 USPQ 207 (7th Cir.1948), modified, 336 U.S. 271 [69 S.Ct. 535, 93 L.Ed. 672], 80 USPQ 451 (1949), adhered to on rehearing, 339 U.S. 605 [70 S.Ct. 854, 94 L.Ed. 1097], 85 USPQ 328 (1950).

In this quote from *Mooney,* the court combined the two components of the test, using the accepted test for equivalence, per *Graver Tank, supra.*

Plaintiffs have implied that the standard for determining literal infringement can be defined as follows:

> In determining whether an accused device or composition infringes a valid pat-

ent, resort must be had in the first instance to the words of the claim. If accused matter falls clearly within the claim, infringement is made out and that is the end of it. *Graver Tank & Mfg. Co., Inc. v. Linde Air Products Co.,* 339 U.S. 605, 607, 70 S.Ct. 854, 855, 94 L.Ed. 1097 (1950).

However, this single quote is very misleading as to what the *Graver Tank* case stated as to literal infringement and it only reflects part of the actual requirement, which has been stated above.

In *Westinghouse v. Boyden Power Brake Co.,* 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898), the Supreme Court held, at page 568, 18 S.Ct. at page 722, as follows:

> The patentee may bring the defendant within the letter of his claims, but if the latter has so far changed the principle of the device that the claims of the patent literally construed, have ceased to represent his actual invention, he is as little subject to be adjudged an infringer as one who has violated the letter of a statute has to be convicted, when he has done nothing in conflict with its spirit and intent. "An infringement, says Mr. Justice Grier in *Burr v. Duryee,* [68 U.S.] 1 Wall. 531, 572 [17 L.Ed. 650, 658] involves substantial identity, whether that same identity be described by the terms 'same principle', same 'modus operandi,' or any other...." The argument used to show infringement assumes that every combination of devices in a machine which is used to produce the same effect is necessarily an equivalent for any other combination used for the same purpose. This is a flagrant abuse of the term "equivalent."

Citing page 568, 18 S.Ct. page 722 of the *Westinghouse* case, *supra,* the court in the *Graver Tank* case, *supra,* stated with respect to the doctrine of equivalents, 339 U.S. at pages 608–9, 70 S.Ct. at page 856:

> The wholesome realism of this doctrine is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in

principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used to restrict the claim and defeat the patentee's action for infringement. *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 568, 42 L.Ed. 1136, 1137, 18 S.Ct. 707 [722].

Clearly, even to find literal infringement, the court must not only find that the terms of a claim read on the accused devices, but also that the accused devices are an equivalent of the device disclosed in the patent in suit.

■ Equivalence is established only if the product accused of infringement performs "substantially the same function in substantially the same way to obtain the same result" as the patent product. *Graver Tank & Manufacturing Co. v. Linde Air Products Co.*, 339 U.S. 605, 608, 70 S.Ct. 854, 856, 94 L.Ed. 1097 (1950). However, the court in the *Graver Tank* case cautioned, at page 609, 70 S.Ct. at page 856, that:

What constitutes equivalency must be determined against the context of the patent, the prior art, and the particular circumstances of the case. Equivalence, in the patent law, is not the prisoner of a formula and is not an absolute to be considered in a vacuum.

and in applying this standard concluded, at page 610, 70 S.Ct. at page 857, that"

The question which thus emerges is whether the substitution of the manganese which is not an alkaline earth metal for the magnesium which is, under the circumstances of this case, and in view of the technology and the prior art, is a change of such substance as to make the doctrine of equivalents inapplicable; or conversely, whether under the circumstances the change was so insubstantial that the trial court's invocation of the doctrine of equivalents was·justified.

■ In a combination patent, i.e., a patent in which the asserted novelty resides in the combination of elements, there is infringement only if the accused device includes all of the elements specifically recited in the claim. Omission of a single element in such a claim clearly avoids infringement. See, *Deepsouth Packing Co. v. Laitram Corp.*, 406 U.S. 518, 528, 92 S.Ct. 1700, 1707, 32 L.Ed.2d 273. Such patents must be strictly confined to the particular combination claimed and are not easily infringed. *Halliburton Oil Well Cementing Co. v. Walker*, 329 U.S. 1, 10–11, 67 S.Ct. 6, 11, 91 L.Ed. 3 (1946). *Foster Cathead Co. v. Hasha*, 382 F.2d 761, 766 (5th Cir.1967), cert. den., 390 U.S. 906, 88 S.Ct. 819, 19 L.Ed.2d 872; *Rountree v. Varco International, Inc.*, 487 F.Supp. 3 (S.D.Tex.1978), *aff'd* per curiam, 618 F.2d 1183 (5th Cir.1980).

■ In a combination patent, every element claimed is deemed to be material to such an extent that evidence to the contrary is not admissible. *Etten v. Kauffman*, 121 F.2d 137 (3d Cir.1941).

The patent in suit is a somewhat modified version of the original patent, of which it is a reissue. The specification of the patent in suit discloses only fixed stops 36 mounted in the tracks which prevent the carriage 21 from moving below predetermined height (Chovanes, Tr. 251). Furthermore, claims 1–5 of the original patent specifically recite such stop means in clause (f) and original patent claim 6 recites a fixed means in clause (g) for "limiting downward movement of said carriage" (Chovanes, Tr. 251–252). Hence, the invention, as described in the specification and claims of the original patent, required some form of stop means or fixed means to prevent downward movement of the carriage below a predefined height.

During the prosecution of the original patent, plaintiff Marcyan's patent attorney amended the claims and, in conjunction with the amendment made the following argument, in an effort to achieve allowance of the claims:

Another highly important feature of applicant's apparatus as claimed relates to the way in which the vertical starting

heights of the body engaging means are adjusted. Because the starting height of the body engaging means is adjustable relative to the carriage by placing it in the selected vertically aligned socket provided in the carriage, the adjustment of the starting height of the body engaging means may be accomplished in complete safety while the weights are at rest on the fixed stops 36.

Patent Office file history (Ex. 20), page 7 of the amendment received June 7, 1971. (See Chovanes, Tr. 263–264).

It should be noted that plaintiff's attorney argued that the stops were fixed, underscoring "fixed" for emphasis. Such statements by a patentee's attorney have the effect of a file wrapper estoppel (Hall, Tr. 230; Chovanes, Tr. 257). This prevents plaintiffs from asserting the claims against a structure which has a carriage with adjustable height, since the carriage is not supported by fixed stops.

 A reissue patent may only describe and claim "the same invention" as the original patent. *Quikey Mfg. Co. v. City Prod. Corp.*, 409 F.2d 876, 161 USPQ 4, 6 (6th Cir.1969); *Maxon Premix Burner Co. v. Mid-Continent Prod. Co.*, 279 F.Supp. 164, 155 USPQ 434, 445 (N.D.Ill.1967); (See also, Chovanes, Tr. 253–254). Otherwise, the patent is invalid. Moreover, no new matter may be introduced into an application for reissue. 35 U.S.C. Sec. 251.

This means that the claims in the reissue patent may not be broadened so as to effectively add new matter to the disclosure. See, e.g., *Bolkcom v. Carborundum Co.*, 523 F.2d 492 (6th Cir.1975), in which it was held that the reissue claim added new matter where the original patent disclosed and claimed only "transfer car" but the reissue application claimed "transfer means"; and *In re East and Harmon*, 495 F.2d 1361 (CCPA 1974), in which it was held that new matter was added where the original disclosure and claims identified "magnetic carrier particles" and the reissue claims recited "carrier particles".

In order that the claims 7 and 8 claim the same invention as in the original patent and do not introduce new matter (i.e., in order for these claims to be given a valid construction), the claim limitation "said carriage being supported in a predetermined starting position", must be construed to incorporate into claims 7 and 8 some form of stop means which prevents movement of the carriage below a predetermined height (claims 1–5) or which is fixed on the upright supporting structure and limits downward movement of the carriage (claim 6) (Chovanes, Tr. 254).

Furthermore, the original patent discloses only that the carriage be supported in a single fixed position at all times by the stop means 36 (Chovanes, Tr. 253). The "predetermined starting position" must therefore mean a fixed position of the carriage, not one that can be varied by the trainee during use. To permit the term "predetermined starting position" to encompass a carriage with trainee-adjustable height would introduce new matter into the reissue application which was not present in the original patent and would render claims 7 and 8 invalid. Accordingly, if claims 7 and 8 are to be valid, "predetermined starting position" must mean a fixed position which is not variable in use (Chovanes, Tr. 254).

The starting point for determining actual meaning of "body engaging means" is the commonly accepted meaning (unless a special meaning is provided in the patent, see Section B 2.c.iii.). Beyond that, the meaning may be limited by the specification, claims and file history (see sections B 2.a.i. and B 2.b.).

The ordinary and accepted meaning of "body engaging means" would require that it include at least all portions of the lifting arm which the trainee contacts during use. In attempting to apply the claims to the accused structure, plaintiffs now seek to define the body engaging means as the hand grip and front part of the bent arm portions of the Power-Pak lifting arm and to ignore the remaining structure. However, this definition is contrary to even the

inventor's conception of what "body engaging means" encompasses.

At trial, Dr. Marcyan was referred to the "Marcy Automatic Barbell Course" (Ex. 3), in which pages 5 and 12 teach that "triceps extensions", and "side bends" should be done while grasping the bar "at the center". Marcyan conceded that certain exercises were done with such a grip (Tr. 123–124). This makes the center of the bar, including the outermost tip of the shank portion, part of the "body engaging means". Marcyan, in fact, admitted that "body engaging means". Marcyan, in fact, admitted that "body engaging means" in claims 7 and 8 corresponded to the lifting arm (Tr. 127).

Column 2, line 4 of the '066 patent provides, under the title "Summary of Invention", that the machine should provide an upright row station. Page 4 of the Barbell course shows that this exercise is to be done with a similar grip at the center. At trial, Mr. Geist demonstrated that this exercise is performed with a grip right near the shank of the lifting arm (Tr. 319–320).

The commonly accepted meaning of "body engaging means" would therefore require that it include all of the lifting bar, but even plaintiffs consider it to include the outermost end of the shank portion.

As set forth in subsection B 2.a., supra, the specification may serve to limit the scope of the claims, but it may never expand them. Initially, it should be noted that the specification provides no specific consistent definition of any of the terms "body engaging means". Accordingly, the accustomed definition must be adopted, as limited by the specification and file history.

Defendants believe that the meaning of the term "body engaging means" is clear when the entire disclosure of the patent in suit is considered. It must mean the entire lifting arm structure 24, including any part which the trainee may engage during use and the shank part which is connected to the carriage.

Plaintiffs are now asserting another meaning in order to attempt to show infringement by the accused Power-Pak devices, arguing that the shank portion of the lifting is not part of the "body engaging means". They must resort to this artificial construction since it was proven at trial beyond a doubt that the shank of the Power-Pak's lifting arm and the cross-piece to which it is joined never change in height relative to the carriage. Plaintiffs are able to argue for this unnatural construction only because of the confusion that they created in the patent in suit by not defining "body engaging means", by using various terms interchangeably (i.e., "lifting arm" and "body engaging portion" and "body engaging element", which are confusingly similar to "body engaging means".

It is noteworthy that both witnesses who testified as to the meaning that should be accorded "body engaging means" in view of the patent disclosure were of the opinion that it meant the entire lifting arm (Hall, Tr. 231; Chovanes, Tr. 255–256).

Some insight to the intended meaning of "body engaging means" can be obtained from clause (c) of claims 7 and 8 itself. Specifically, clause (c) defines the "body engaging means" as means for "moving said carriage upwardly along said track means". 35 U.S.C. Sec. 112 provides, in relevant part, that "an element in a claim for a combination may be expressed as a means or step for performing a specified function ... and such claim shall be construed to cover the corresponding structure ... described in the specification". Hence, the body engaging means must include all necessary parts "for moving said carriage upwardly" (the specific function). The term "body engaging means" must therefore include the entire lifting arm 24 in order to achieve the specified function. If the shank was excluded, the specified function could not be performed.

Furthermore, that all parts of the lifting arm are needed is confirmed by the claim recitation "whereby when said body engaging means is pushed upwardly, it tends to apply an eccentric force to said carriage". If the "body engaging means" did not include the shank 40, or an equivalent rigid

connection, there would be no way to apply an eccentric force to the carriage by urging the handgrips 47 upwardly.

Hence, by the very terms of claims 7 and 8, the "body engaging means" must include the entire lifting arm. In accordance with the remainder of clause (c), the entire vertical lifting arm must be "vertically adjustable relative to said carriage whereby said body engaging means (lifting arm) may be adjusted into different vertical starting heights relative to said carriage" (Chovanes, Tr. 254–256). This describes the feature disclosed in the preferred embodiments whereby the entire lifting arm is vertically displaced into the different sockets to achieve the different starting heights. Mere inversion of a bent lifting arm would not meet this limitation, because the entire lifting arm would not be "adjusted into different vertical starting heights relative to said carriage" (Chovanes, Tr. 257). There is no disclosure in the patent of achieving vertical adjustment by inversion alone (Chovanes, Tr. 253).

If there is any doubt where "body engaging means" must be construed to be the entire lifting arm, it is resolved by the following statement which the patentee's (Marcyan's) attorney made to the Patent Office during the prosecution of the original patent (No. 3,635,472):

Another highly important feature of applicant's apparatus as claimed relates to the way in which the vertical starting heights of the body engaging means are adjusted. Because the starting height of the body engaging means is adjustable relative to the carriage by placing it in the selected vertically aligned socket provided in the carriage, the adjustment of the starting height of the body engaging means may be accomplished in complete safety while the weights are at rest on the fixed stops 36.

Patent Office file history (Ex. 20), page 7 of the amendment received June 7, 1971 (see Chovanes, Tr. 264). According to this statement, the "body engaging means is adjustable relative to the carriage by placing it in the selected vertically aligned

socket". Hence, the shank portion of the lifting arm, which is inserted into the socket, must be part of the "body engaging means".

█ At trial, Mr. Chovanes discussed (Tr. 264–267) an amendment filed August 9, 1970 in the parent application (Ex. 20) in which Marcyan's attorney argued that the claims should not be limited to an arrangement of vertically spaced sockets in the carriage to achieve the vertical adjustment of the lifting arm relative to the carriage. Marcyan's attorney discussed three alternate embodiments for achieving the vertical adjustment without the sockets. Each one of them contemplated movement of an entire non-bent (flat) lifting arm with respect to the carriage (Chovanes, Tr. 226, Ex. LL). The foregoing statements were made by plaintiff's attorney in the course of an amendment in an effort to achieve allowance of the amended claims. Hence, there is a file wrapper estoppel which prevents plaintiffs from asserting that the term "body engaging means" does not cover the entire lifting arm.

Furthermore, the alternate embodiment of Figs. 15–18 of the patent shows a lifting arm which is not bent, but is vertically displaceable in its entirety relative to the carriage. Thus, starting height adjustment is achieved by the vertical displacement of the entire arm relative to the carriage and inversion would be of no consequence (Marcyan, Tr. 129–130).

All of the foregoing makes it clear that the vertical adjustment must include actual displacement of the entire arm (Chovanes, Tr. 266) and confirms that "body engaging means" refers to the entire lifting arm.

That the definition of "body engaging means" in clause (c) of claims 7 and 8 contemplates the vertical displacement of the entire lifting arm with respect to the carriage (i.e., more than mere inversion) is entirely consistent with the patentee's understanding of his invention. He, in fact, conceded that "body engaging means" in the claims means the lifting arm (Marcyan, Tr. 127) and that, in the alternate embodiment of Figs. 15–18, all vertical ad-

justments were made without inversion of the arm (Marcyan, Tr. 129). Furthermore, in a deposition taken January 26, 1982, he testified clearly several times that he did not consider the use of an invertible lifting arm to be his invention. For example, at page 33:

Q. Now, incidentally, you said that bent arm was not new. You didn't consider that the inversion feature of the bent arm was an invention?

A. I don't believe it is.

Q. An in other words, in your patent, it's not that—by itself is not a invention?

A. I don't believe so.

See also, page 35, line 25 through page 36, line 11 and page 37, line 6 through page 38, line 4.

"The patent law imposes an obligation on an applicant to point out and distinctly claim the subject matter that he regards as his invention in the claim that he submits to the Patent Office. 35 USC Section 112." *Super Products Corp. v. D P Way Corp., supra,* at 756. As has been demonstrated above, Marcyan did not consider the invertible lifting arm alone to be his invention. Furthermore, he indicated at pages 31–32 of his deposition of January 26, 1982, that his invention contemplated the vertical displacement of the lifting arm relative to the carriage.

Hence, if claims 7 and 8 are to be valid under 35 U.S.C. Sec. 112, the claims must be construed to include some structure for achieving vertical displacement of the lifting arm relative to the carriage in order to adjust starting height.

 Although plaintiffs would now urge a claim construction which would capture the defendants' product, this is not available to them:

The patent must be judged by what is claimed for it in the patent application— not what is asserted in subsequent litigation.

*Ohio Citizens Trust Co. v. Lear Jet Corp.,* 403 F.2d 956 (10th Cir.1968), *cert. den.,* 394 U.S. 960, 89 S.Ct. 1308, 22 L.Ed.2d 561 (1969). It is the vertical displacement of the lifting arm (e.g., by means of the spaced socket arrangement) which is claimed, according to the inventor's understanding of his invention. Defendants' Power-Pak machine, does not utilize this feature. Therefore, it cannot and does not infringe.

## IV.

 Plaintiffs have alleged violation of Section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a) by virtue of statements made in an endorsement by Mr. Coker in the front of defendants' Power-Pak Instruction Manual (Ex. 23). These statements on their face are not actionable and plaintiffs have not proved that they are. As one case states:

*[B]ernard Food Industries v. Dietene Company, supra,* [415 F.2d 1279 (7th Cir.1969), cert. denied 397 U.S. 912, 90 S.Ct. 911, 25 L.Ed.2d 92 (1970) ] requires plaintiff to allege the following elements in order to state a claim upon which relief may be granted under Section 43(a) of the Lanham Act: (1) in its comparison advertisements, defendant made false statements of fact about its own product; (2) those advertisements actually deceived or have the tendency to deceive a substantial segment of their audience; (3) such deception is material, in that it is likely to influence the purchasing decision; (4) defendant caused its falsely advertised goods to enter interstate commerce, and (5) plaintiff has been or is likely to be injured as the result of the foregoing either by direct diversion of sales from itself to defendant, or by lessening of the goodwill which its products enjoy with the public.

*Skil Corp. v. Rockwell International Corp.,* 375 F.Supp. 777, 782 (N.D.Ill.1974). Plaintiffs were unable to prove the existence of any of these elements at trial.

As to element (1) set forth in *Skil,* defendants have neither made comparison advertisements nor false statements about their products. The statement of which plaintiffs complain under the second count

of the complaint is in an endorsement in defendants' Power-Pak Exercise Manual. This manual is not advertising material, nor is it distributed to the general public for the purpose of promoting plaintiffs' products: it is a user's manual and is provided to a purchaser of the defendants' equipment together with the equipment in order to describe its proper use. Although, Mr. Mahnke stated that he had seen the manuals available at trade shows (Tr. 149), plaintiffs provided no proof that the endorsement was ever made available to the general purchasing public or in sufficient quantities to constitute an advertisement.

As to the requirement of "false statements of fact", a careful review of plaintiffs' allegations will reveal that no such false statements have been alleged, much less proven. Plaintiffs seem to find a falseness in the circumstances that Mr. Coker's endorsement asserts that the defendants' devices are the best exercising machines of their type, but, in his deposition, testimony was to the effect that the devices did not comply with his concept of an ideal exercise motion (i.e., that a trainee was required to move the carriage through a straight line path in use which is not "a true neuromuscular pattern"). However, there is no inconsistency in the endorsement. It did not state that the defendants' devices are perfect, but merely that they are the best of their kind available. Plaintiffs have not offered one shred of evidence that Mr. Coker in any way disagrees with the statement in the endorsement or that it is not true. Accordingly, there is no "false statement".

Furthermore, it is recognized that statements of the type made in Mr. Coker's endorsement, which set forth in general terms that one product is superior, are not actionable as false advertisement. *Smith-Victor Corporation v. Sylvania Electric Products*, 242 F.Supp. 302, 308 (N.D.Ill. 1965). These are, at worst, merely considered as "puffing".

As to elements (2) and (3) of the *Skil* case, plaintiffs have no basis for asserting deception or a tendency to deceive a sub-stantial segment of the audience by the accused statement. At page 53, lines 7–11 of the Marcyan deposition of January 26, 1982, the following discourse occurred:

Q. Can you tell me of any instance that you know personally or that anybody has told you of where your product was not purchased and the defendant's product was purchased instead because of Mr. Coker's advertisement?

A. No, I can't say that I do.

Hence, although the Coker endorsement has been available since December 17, 1979, over two years, the patentee and president of the corporate plaintiff does not know of one instance in which there was a deception or that the endorsement caused a loss of sales. Plaintiffs did not even attempt to prove the existence of even one such instance of deception or loss of sale at trial. It is submitted that this is ample evidence that deception of any substantial segment of the audience is unlikely to occur.

Also, as to element (3) of the *Skil* case, point (2). Furthermore, since the statement was made in a manual which, typically, would not be available until after the purchase was made (see, the discussion of point (1)), there is no likelihood of influencing the purchasing decision.

As to point (4) of the *Skil* case, defendants could not have caused falsely advertised goods to enter interstate commerce if the accused statement was not made in an advertisement and was not false (see the discussion of point (1)).

As to point (5) of *Skil*, it is clear that the plaintiffs have not been and are not likely to be injured. In over two years, there has not been one instance of loss of business (see the discussion of points (2) and (3), above). Further in this regard, Dr. Marcyan stated (Tr. 130) that the selling price for his Body Bar unit was as low as $179. The least expensive comparable, single station unit offered by defendants would sell for about $500 (Tr. 130). Based upon this large price difference, it is clear that plaintiffs and defendants are not really in com-

petition, so that any incidence of injury is highly unlikely.

To recover damages under 15 U.S.C. Sec. 1125(a), plaintiffs must establish that the buying public was actually deceived; in order to obtain equitable relief, only a likelihood of deception need be shown. *Hesmer Foods, Inc. v. Campbell Soup Company*, 346 F.2d 356, 359 (7th Cir.1965), *cert. den.*, 382 U.S. 839, 86 S.Ct. 89, 15 L.Ed.2d 81. Under the analysis related to points (2) and (3) of *Skil*, it is clear that plaintiffs would not be able to obtain damages with respect to their second count and would also be unable to obtain injunctive relief.

As indicated in the findings of fact and conclusions of law a judgment shall enter in favor of the defendants against the plaintiffs.